IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

ALVIN MARVIN DEMAR,

   **Defendant.**

CRIMINAL ACTION FILE
NO. 1:22-CR-00404-ELR-JEM-1

UNITED STATES MAGISTRATE JUDGE'S
NON-FINAL REPORT AND RECOMMENDATION

Pending before the Court are Defendant's motion to suppress evidence, (Doc. 22), and motion to suppress statements, (Doc. 23). For the below reasons, the Court **RECOMMENDS** that both motions be **DENIED**.

I.    **BACKGROUND**

The one-count indictment, which was returned by a federal grand jury sitting in the Northern District of Georgia on November 8, 2022, charges Defendant, Alvin Demar, with being a felon in possession of a firearm on December 7, 2019, in violation of 18 U.S.C. § 922(g)(1).[1] (Doc. 1.) On May 19, 2023, Demar filed the pending motion to suppress the evidence that was obtained during a warrantless search of his vehicle on December 7, 2019, which includes the following: (1) a Glock .22 pistol (PTA136); (2) marijuana; (3) Percocet pills; (4) MDMA pills; (5) all observations made by law enforcement during the illegal

---

[1] Demar is also charged with eight firearm-related counts in NDGA case 1:22-CR-00389-ELR-JEM-1, which is currently pending.

search; and (6) all fruits of the illegal search and seizure. (Doc. 22.)  On the same date, Demar also filed the pending motion to suppress the statements he made to law enforcement officers during the traffic stop on December 7, 2019, which includes that: (1) Demar and his wife smoked marijuana prior to being stopped; (2) marijuana was inside the vehicle; (3) the gun located inside the vehicle belonged to Demar; and (4) Demar was a convicted felon. (Doc. 23.)

The Court held an evidentiary hearing for both of Demar's motions on October 12, 2023, and having now received the parties' post-hearing briefs, the matter is ripe for review. (Docs. 30; 35; 38; 39; 40.)

## II.   STATEMENT OF FACTS

Atlanta Police Department (APD) Officer Christopher Wade testified that on December 7, 2019, he and his partner, Officer Dean McHale, were patrolling in Zone 6, which is the east side of Atlanta, in a marked police vehicle. (Doc. 35 at 4-7, 10-12, 19-20.)[2] While driving Southbound on Boulevard, near Oakland Cemetery, they passed a car that was emitting an odor of burning marijuana. (*Id.* at 7-8, 11-12, 20-24.) They looked for the car emitting the odor, which they believed was a silver Chevrolet, located the car in a vacant lot, got directly behind the car, and followed it Northbound on Boulevard. (*Id.* at 12-13, 22-27; Govt. Ex. 1 at 00:00-2:00.)[3] Wade testified that he is very familiar with the odor of

---

[2] Transcript cites refer to the Court Reporter's page numbering, not the Court's ECF numbering.

[3] Wade wore a body camera, and the footage captured by his body camera, which includes the entirety of the traffic stop, was admitted into evidence. (Doc. 35 at 8-11; Govt. Ex. 1.) Wade testified that the first two minutes of the video,

marijuana, having handled several cases throughout his career that involved raw marijuana, burnt marijuana, and burning marijuana, and that in his experience, the odor of burning marijuana can linger in clothes, fabric, or even the air. (Doc. 35 at 14, 34-35.) Wade also testified that his driver-side window in the police vehicle was down, and that the driver-side window of the car they were following was down. (*Id.* at 14-15, 21-22, 26.) Wade was unsure if McHale's passenger-side window in the police vehicle was down. (*Id.* at 21-22.) Wade activated the blue lights on the police vehicle to initiate a traffic stop of the car emitting the odor. (Doc. 35 at 13-14, 26; Govt Ex. 1 at 2:00.) Defendant, Alvin Demar, was the driver of that car, which Wade learned when he later obtained Demar's identification as part of the traffic stop. (Doc. 35 at 8, 26-27, 32-33.)

While still in the police vehicle following behind Demar, Wade stated to McHale that the driver of the car they were following was "spraying the blunt, you smell it, you smell that air freshener," and McHale replied "yep." (Doc. 35 at 13-15, 26; Govt. Ex. 1 at 2:33-2:37.) Wade then activated the siren on the police vehicle, and at that point, as both vehicles pulled over to the side of the street, McHale stated "oh man, he's definitely trying to hide that," to which Wade

_____

which shows Wade's viewpoint while Wade and McHale were in the police vehicle driving, does not include audio because the body camera always includes a two-minute video segment of the events happening prior to actual activation of the body camera, and here, the body camera, with audio, was activated when Wade activated the lights to initiate the traffic stop. (Doc. 35 at 6-8.) Wade also explained that, although the traffic stop occurred on December 7, 2019, the date on the video shows December 8, 2019, and that is because the video is on Zulu time, as indicated by the "Z" on the far right side of the timestamp, which is roughly five hours ahead of Eastern Standard time. (Doc. 35 at 10-11.)

responded, "yep, he's trying to hide the hell out of it." (Govt. Ex. 1 at 2:37-2:46.) Wade testified that Demar sprayed air-freshener in an attempt to mask the marijuana odor, but that when Wade approached Demar's car on the driver-side, he could still smell the odor of burning marijuana. (Doc. 35 at 13-16, 26; Govt. Ex. 1 at 2:50-3:05.) And later, when Wade was assisting with searching the car after Demar and his wife, who was the passenger in the car, had gotten out, Wade stated again "yeah, you can smell the weed." (Govt. Ex. 1 at 9:38.)

Wade told Demar that he was stopped because when they "rolled by" him, and also when they were following behind him, they noticed that "your car smells like weed." (Govt. Ex. 1 at 3:05-3:13.) Demar responded that he and his wife had previously smoked joints in the car. (Doc. 35 at 15, 27; Govt. Ex. 1 at 3:13-3:16, 3:30-3:39.) Wade asked if there was any weed in the car, and Demar responded that they had "smoked it." (Govt. Ex. 1 at 3:16-3:23.) Wade asked for Demar's identification, which Demar provided, and Wade then asked Demar to step out of the car. (Govt. Ex. 1 at 3:23-3:54.) Wade also asked what Demar had sprayed in the car, and Demar replied "blunt spray." (Doc. 35 at 16; Govt. Ex. 1 at 3:47-3:51.) After Demar got out of the car, Wade asked him to step toward the back of the car, and stated that he was not going to handcuff him. (Govt. Ex. 1 at 3:51-4:01.) Wade then asked Demar's wife if there was any more marijuana in the car, to which she responded "no," and Wade asked her to also step out of the car. (Govt. Ex. 1 at 4:03-4:12.) Wade approached Demar where he was standing near the back of the car, and asked "mind if I check you?" (Govt. Ex. 1 at 4:12-4:15.) Demar put his arms up, at which point Wade stated "I'm looking for weed . . .

you smell [like] weed . . . sure you don't have any weed on you?" (Govt. Ex. 1 at 4:15-4:19.) Demar responded that he did not. (Govt. Ex. 1 at 4:19-4:21.) While Wade was checking Demar's pockets, he stated "you could have told me you had a gun in the door," and Demar did not verbally respond. (Govt. Ex. 1 at 4:21-4:33.) Wade also told Demar to "relax," because "I'm not putting you in handcuffs or nothing like that, it's just weed, that's all it is." (Govt. Ex. 1 at 4:33-4:53.) Wade asked Demar if he had "any more weapons on you, or anything like that," and Demar again did not verbally respond.[4] (Govt. Ex. 1 at 4:53-5:00.) Demar then stated to Wade that he did have "a little marijuana," in the middle console of the car. (Govt. Ex. 1 at 5:00-5:04.) As Wade moved toward the front of the car, he asked Demar "is this your weapon?" referring to the gun in the pocket of the driver-side door, and Demar responded that it was. (Doc. 35 at 16-17; Govt. Ex. 1 at 5:04-5:10.) Wade stated to McHale "yeah, that's it," as McHale opened the middle console, and began searching for the marijuana Demar stated was in the middle console. (Doc. 35 at 18; Govt. Ex. 1 at 5:10-5:23.) Wade then handcuffed Demar, and stated that he was doing so because "you got a gun right here, and there's weed right here," but he told Demar that he was not going to jail. (Doc. 35 at 17, 32; Govt. Ex. 1 at 5:23-5:38.) Wade next asked Demar if he had ever been convicted of a felony, and Demar immediately responded "yes, sir." (Govt. Ex. 1 at 5:38-5:41.) Wade then removed the gun, which he testified was a

---

[4] It is unclear from the video if Demar nodded or shook his head in response to questions to which he did not verbally respond. (Govt. Ex. 1 at 4:21-4:33, 4:53-5:00.) It appears that he may have done so, given that Wade proceeded as if his question had been answered. (*Id.*)

loaded Glock, from the pocket of the driver-side door, and he unloaded it. (Doc. 35 at 17-18; Govt. Ex. 1 at 5:42-6:04.)

Wade testified that when he and McHale thought the only offense at issue was marijuana possession, they planned to issue a citation, but upon learning that Demar was a convicted felon, which they learned when Demar responded "yes, sir," to Wade's question, the decision was made that Demar would be arrested. (Doc. 35 at 17, 34; Govt. Ex. 1 at 5:38-5:41, 8:40.) Wade testified that he also verified Demar's convicted felon status by running Demar's identification and criminal history. (Doc. 35 at 17, 34.) The evidence seized from Demar's car included a small quantity of raw marijuana in a plastic bag, Percocet in a prescription pill bottle that was not issued in Demar's or his wife's name, MDMA pills, suspected liquid codeine, and the Glock firearm. (Doc 35 at 18-19, 27-31, 33-34; Govt. Ex. 1 at 5:00-14:30.)

## III.   DISCUSSION

### A. APD officers had reasonable suspicion justifying the initial traffic stop, and probable cause to conduct the subsequent automobile search.

Demar argues that the APD officers lacked reasonable suspicion to initially stop him for two reasons: (1) Wade's testimony about smelling marijuana was not credible, (Docs. 38 at 5-7; 40 at 1-5); and (2) marijuana odor, even assuming that the officers smelled it, no longer provides reasonable suspicion for a stop because marijuana and hemp, which has been legalized, smell the same, so the officers needed "additional evidence" to lawfully conduct a stop, (Docs. 38 at 7-

11; 40 at 1-5). The government argues that Wade's testimony was credible, and that the odor of marijuana still provides reasonable suspicion to stop and probable cause to search, notwithstanding any similarity it has to the odor of hemp, so the stop and the search were lawful. (Doc. 39 at 7-12.) The Court will address each argument in turn.

### (i)    Officer Wade's testimony was credible.

First, the Court finds that all of Wade's testimony was credible based on the Court's personal observation of him at the evidentiary hearing, and also on the fact that his testimony was given under oath, it was fully corroborated by the body camera footage, and it was uncontroverted. *See United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony, and the "choice of whom to believe is conclusive on the [reviewing] court unless the judge credits *exceedingly* improbable testimony") (emphasis in original)).

Second, notwithstanding the Court's finding that all of Wade's testimony was credible, even if the Court found that the specific testimony that Demar challenges was not credible, it would not result in the Court ultimately finding that there was no presence of marijuana odor justifying the traffic stop. Demar asserts that "[i]t is simply not credible" to believe that Wade could have initially smelled marijuana as they passed a line of cars at 35 miles per hour, or that the officers could have then correctly identified Demar's car out of all the cars they passed as the one that was emitting the odor. (Doc. 38 at 5-7.) The Court does not

agree that this testimony is unbelievable given Wade's law enforcement experience, the fact that at least one of the windows, and maybe all of the windows, in each vehicle was down, and the fact that 35 miles per hour, assuming it was even 35,[5] is not a high rate of speed. *See United States v. Rivera*, 775 F.2d 1559, 1561 (11th Cir. 1985) (holding that to be incredible as a matter of law, the testimony of a government witness must be "unbelievable on its face" — *e.g.* facts the witness physically could not have observed, or events that could not have occurred under the laws of nature). But even if the officers here incorrectly identified Demar's car as the car they initially smelled as they passed at 35 miles per hour, the uncontroverted evidence — both Wade's testimony and the body camera footage — establishes that the officers followed directly behind Demar's car for a period of time, that at least one of the windows (and maybe all of the them) in each vehicle was down, and that a distinct marijuana odor, as well as the attempted "blunt spray" cover-up, was coming from the car that they followed and then stopped. (Doc. 35 at 12-16, 22-27; Govt. Ex. 1 at 0:00-2:00, 2:33-2:46, 9:38); *United States v. Moore*, 456 F.2d 223, 224 (5th Cir. 1972)[6] (finding that when law enforcement witness provides uncontroverted testimony of a fact, the evidence is sufficient to show that fact); *United States v. Kalu*, 485 F. App'x 366,

_____

[5] Wade testified that he was driving "[t]hirty-five maybe. I'm not sure." (Doc. 35 at 22.) Though Wade's speedometer is not visible the entire time, at least some portions of the video footage during the first two minutes show that the speedometer is below 35. (Govt. Ex 1 at 0:00-2:00.)

[6] In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit that were issued before October 1, 1981.

369 (11th Cir. 2012) (same); *United States v. Almagro,* 393 F. App'x 627, 632 (11th
Cir. 2010) (same).

> ### (ii)    The odor of marijuana provided reasonable suspicion to justify the traffic stop.

Law enforcement officers may temporarily detain an individual for
questioning when the officers have a reasonable suspicion that the individual is
engaging in or is about to engage in criminal activity, and the detention is
reasonably related in scope to the circumstances justifying the interference in the
first place. *Terry v. Ohio*, 392 U.S. 1, 18-21 (1968). The *Terry* reasoning applies to
law enforcement officers conducting an investigatory stop of a vehicle when
there is reasonable suspicion. *United States v. Sharpe*, 470 U.S. 675, 682 (1985).
Reasonable suspicion requires more than a hunch, and must be "supported by
articulable facts that criminal activity may be afoot." *United States v. Sokolow*, 490
U.S. 1, 7 (1989) (citing *Terry*, 392 U.S. at 27-30) (internal quotation omitted). The
reasonable suspicion standard is a less demanding standard than probable cause,
however, which requires "a fair probability that contraband or evidence of a
crime will be found." *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The
level of suspicion required for reasonable suspicion is less than "a fair
probability," and is "considerably less than proof of wrongdoing by a
preponderance of the evidence." *Sokolow*, 490 U.S. at 7; *see also United States v.
Smith*, 201 F.3d 1317, 1323 (11th Cir. 2000) ("[a]lthough reasonable suspicion
requires more than a hunch, the requisite level of suspicion to make an
investigative stop is considerably less than proof of wrongdoing by a

preponderance of the evidence") (internal quotes and citation omitted)). The Supreme Court has also described the reasonable suspicion standard as requiring "a moderate chance of finding evidence of wrongdoing," *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 371 (2009); and as requiring "at least a minimal level of objective justification," *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

It is well settled that the recognizable odor of marijuana, alone, provides probable cause. *See United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) ("There is no doubt that the agent's suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana"); *United States v. Dumas*, No. 21-11341, 2023 WL 3302878, at *4 (11th Cir. May 8, 2023) (holding that "when an officer detects the odor of marijuana emanating from a vehicle, there is probable cause to support a warrantless search of the vehicle"); *Adams v. Off. of Governor*, 818 F. App'x 887, 889 (11th Cir. 2020) (the probable cause standard is met when an officer detects the smell of marijuana); *United States v. Flippo*, 759 F. App'x 907, 909 (11th Cir. 2019) (holding that the "strong" odor of marijuana that wafted out of defendant's vehicle provided probable cause for the deputies to conduct a warrantless search of the vehicle); *United States v. Smith*, 481 F. App'x 540, 544 (11th Cir. 2012) (holding that upon detecting marijuana odor emanating from defendant's car, the officers were justified to conduct the search of the vehicle).

It logically follows, and is also well settled, that marijuana odor similarly provides the less demanding reasonable suspicion required to conduct further investigation. *United States v. White*, 593 F.3d 1199, 1201-03 (11th Cir. 2010)

(holding that initial traffic stop was valid given officer's credible testimony that he smelled a "strong" odor of marijuana emanating from the car); *United States v. Garcia*, 592 F.2d 259, 260 (5th Cir. 1979) (holding that reasonable suspicion was supplied by the smell of the marijuana emanating from the vehicle); *United States v. Roberts*, 849 F. App'x 863, 866-67 (11th Cir. 2021) (holding that the odor of marijuana gave the detectives a reasonable, particularized suspicion to detain each individual in the group of five people).

Here, Demar argues that marijuana and hemp, which the State of Georgia legalized on May 10, 2019, smell the same, and because the marijuana that the officers smelled on December 7, 2019, could just as easily have been legal hemp, the officers needed "additional evidence" in order to lawfully conduct the traffic stop. (Docs. at 7-11; 40 at 1-5.) Demar's argument is contrary to this Circuit's binding and persuasive authority cited above, which includes cases issued after May 10, 2019, and is unconvincing.[7]

First, the uncontroverted evidence establishes that the officers smelled marijuana emanating from Demar's car on December 7, 2019. (Doc. 35 at 12-16, 22-27; Govt. Ex. 1 at 0:00-2:00, 2:33-2:46, 9:38); *Moore*, 456 F.2d at 224 (finding that when law enforcement witness provides uncontroverted testimony of a fact, the evidence is sufficient to show that fact); *Kalu*, 485 F. App'x at 369; *Almagro*, 393 F. App'x at 632. Based on that alone, Demar's argument fails. Following this

---

[7] The Court notes that the cases cited herein represent only a small number of this Circuit's extensive binding and persuasive precedent holding that marijuana odor supplies probable cause, as well as reasonable suspicion.

Circuit's binding and persuasive authority, the officers had reasonable suspicion to initiate the traffic stop. *See White*, 593 F.3d at 1201-03; *Tobin,* 923 F.2d 1506; *Dumas*, 2023 WL 3302878, at *4; *Roberts*, 849 F. App'x at 866-67; *Adams*, 818 F. App'x at 889.

Second, there is no evidence before this Court establishing that the smell of burning hemp and the smell of burning marijuana are indistinguishable from each other. (Doc. 35 at 1-35; Govt. Ex. 1.) There are only counsel's statements at the hearing saying so, and the arguments in Demar's brief, which are not evidence. *See United States v. Kendrick*, 682 F.3d 974, 987 (11th Cir. 2012) (explaining that "statements and arguments of counsel are not evidence"). But even assuming that illegal marijuana and legal hemp emit the same indistinguishable odor, which the Court does not find based on the evidence here, Demar's argument still fails under the reasonable suspicion standard. As discussed above, reasonable suspicion does not require certainty. "The existence of reasonable suspicion depends on probabilities, not hard certainties." *United States v. De La Rosa*, No. 21-11923, 2022 WL 1559159, at *1 (11th Cir. May 17, 2022) (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981)). Reasonable suspicion requires only "a moderate chance of finding evidence of wrongdoing." *Safford*, 557 U.S. at 371; *see also Wardlow*, 528 U.S. at 124 (reasonable suspicion requires "at least a minimal level of objective justification"); *Sokolow*, 490 U.S. at 7 (reasonable suspicion requires less than "a fair probability," that criminal activity "*may* be afoot") (emphasis added); *Smith*, 201 F.3d at 1323 (reasonable suspicion requires "considerably less than proof of wrongdoing by a preponderance of the

evidence"). Reasonable suspicion also does not require that an officer rule out every non-criminal explanation for what he perceives, and the mere fact that marijuana odor could be emanating from a legal source does not eliminate the reasonable suspicion that it is emanating from an illegal source. *See United States v. Bruce,* 977 F.3d 1112, 1120 (11th Cir. 2020) (explaining that reasonable suspicion does not require law enforcement to "rule out the possibility of innocent conduct," and finding that officers had "at least a minimal level of objective justification" to stop the defendant for investigative purposes); *United States v. Lewis*, No. CR 22-0222-WS, 2023 WL 4982247, at *1 (S.D. Ala. Aug. 3, 2023) (following Eleventh Circuit precedent in *United States v. White*, 593 F.3d 1199, 1203 (11th Cir. 2010), and finding that despite the legality of hemp, marijuana odor still supplies reasonable suspicion); *see also United States v. McCallister*, 39 F.4th 368, 373 (6th Cir. 2022) (rejecting defendant's lack of reasonable suspicion argument on ground that marijuana odor could have been from legal hemp because reasonable suspicion does not require proof that the suspect committed a crime, and there is "at least a moderate chance" that the odor came from illegal marijuana); *United States v. Axon*, No. 8:21-CR-374-VMC-CPT, 2023 WL 4927017, at *2 (M.D. Fla. Aug. 2, 2023) (rejecting defendant's argument that the Court should ignore Eleventh Circuit precedent issued before hemp and medical marijuana were legalized, and noting that subsequent Eleventh Circuit case law still holds that marijuana odor provides probable cause).

### (iii)   The search of the car was lawful.

For most of this century, it has been well settled that the Fourth Amendment does not require the police to obtain a warrant to search an automobile so long as the police have probable cause to believe that such vehicle contains contraband or evidence of a crime. *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996). This long-established "automobile exception" or "vehicle search exception" to the Fourth Amendment's prohibition against warrantless searches rests on the understanding that vehicles are inherently mobile, thus making it impractical for law enforcement to obtain a search warrant in an expeditious manner, and it also stems from the understanding that the occupants of a vehicle have an inherently reduced expectation of privacy. *Id.* "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more." *Id.*

When there is probable cause to search a vehicle, officers may search "every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). Further, officers may inspect any container potentially concealing contraband in the vehicle, regardless of whether such container or package is owned by the driver or the passenger. *Wyoming v. Houghton*, 526 U.S. 295, 301 (1999). In articulating the automobile exception to the general rule against warrantless searches, the Courts have held that the scope of a warrantless search conducted pursuant to the automobile exception extends as far as "a magistrate could legitimately authorize by warrant." *Ross*, 456 U.S. at 825.

Here, as discussed above, the uncontroverted evidence establishes that the officers detected a distinct marijuana odor emanating from Demar's car. (Doc. 35 at 12-16, 22-27; Govt. Ex. 1 at 0:00-2:00, 2:33-2:46, 9:38); *Moore*, 456 F.2d at 224; *Kalu*, 485 F. App'x at 369; *Almagro*, 393 F. App'x at 632. The marijuana odor provided probable cause for the officers to conduct a warrantless search of every part of the vehicle and its contents that may have concealed marijuana. *Ross*, 456 U.S. at 825; *Tobin*, 923 F.2d at 1512; *Dumas*, 2023 WL 3302878, at *4; *Adams*, 818 F. App'x at 889.

Accordingly, the Court **RECOMMENDS** that Demar's motion to suppress evidence, (Doc. 22), be **DENIED**.

### B. Because the traffic stop was lawful, and *Miranda* was not implicated or violated, Demar's statements are admissible.

Demar argues that all of the statements he made during the traffic stop on December 7, 2019, should be suppressed because they are the fruit of the poisonous tree—the illegal traffic stop; and alternatively, he argues that his statements were made in violation of *Miranda*. (Docs. 38 at 11-13; 40 at 5); *see Miranda v. Arizona*, 384 U.S. 436 (1966) (holding that certain specific warnings must be given in order for a defendant's statement(s) made during custodial interrogation to be admitted into evidence). Demar's fruit of the poisonous tree argument fails because, as discussed above, the traffic stop and search were lawful. *See Supra*, Section III(A); *United States v. Lopez-Garcia*, 565 F.3d 1306, 1315 (11th Cir. 2009) (finding that because the defendant's Fourth Amendment rights were never violated, his "fruit of the poisonous tree argument plainly

collapses"); *United States v. Cherry*, No. 1:18-CR-00503-SCJ, 2020 WL 1026712, at *6 (N.D. Ga. Mar. 3, 2020) (finding that because the search was lawful, the defendant's argument that his statements were "the fruit of the unlawful search" fails).

 As for Demar's alternative argument that his statements violated *Miranda,* Demar concedes that he was not "in custody" for purposes of *Miranda* prior to being handcuffed. (Doc. 38 at 11-12). Demar states that "once the police handcuffed Mr. Demar and told him he was being detained (Gov. Exh 1 at 5:22), he was in custody and *Miranda* applied." (Doc. 38 at 11-12.) The only statement that Demar made after he was placed in handcuffs was the statement that he was a convicted felon, but though that statement was made after he was handcuffed, it was made before he was told he was being detained and arrested. (Govt. Ex. 1 at 5:23-5:41.) As discussed below, the Court finds that all of Demar's statements, including his statement that he was a convicted felon, are admissible.

 The purpose of a *Terry* stop is to give the investigating officers the opportunity to "investigate the circumstances that provoke suspicion." *Berkermer v. McCarty*, 468 U.S. 420, 439 (1984) (internal citation and quotes omitted). The scope of the inquiry is guided by the purpose of the stop. *Id.* "Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id.* The detainee is not obliged to respond, and if the detainee's answers do not provide probable cause to arrest, the detainee must be released. *Id.* at 439-440. Because of the "nonthreatening character of detentions of

this sort," *Miranda* warnings are generally not required to be given as part of a *Terry* stop. *Id.* at 440; *see also United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988) ("[a] *Terry* stop is justified to give the police an opportunity to engage in brief and nonintrusive investigation techniques, such as noncustodial questioning of the detained person"). That is, although Courts normally apply a two-part test to determine if a person is "in custody" for *Miranda* purposes, asking: (1) "what were the circumstances surrounding the interrogation"; and (2) "given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave"; a person detained for a *Terry* stop is "not free to leave from the beginning of the stop until it ends." *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004). So if the general *Miranda* custodial test was applied literally to *Terry* stops, "the result would be that *Miranda* warnings are required before any questioning could occur during any *Terry* stop." *Id.* In *Berkemer*, the Supreme Court provided "guidance on the issue of when *Miranda* warnings may be required before interrogation during a *Terry* stop." *Id.* "Instead of asking whether a suspect reasonably would feel free to leave," the question should be "whether a traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Acosta*, 363 F.3d at 1149 (citing *Berkemer*, 468 U.S. at 437). The *Berkemer* Court recognized two key factors that mitigate the pressures upon a detained person during a stop, so that the detainee need not be given *Miranda* warnings. *Acosta*, 363 F.3d at 1149 (citing *Berkemer*, 468 U.S. at 438). First, detention for a traffic stop

is "presumptively temporary and brief," and second, most detainees would not "feel completely at the mercy of the police." *Id.* (alterations omitted). In other words, the brief and usually spontaneous nature of traffic stops reduces the danger that any kind of trickery or subterfuge will be used by law enforcement to elicit a confession as "[a] police officer who stops a suspect on the highway has little chance to develop or implement a plan of this sort"; and also, though the inherent authority of armed law enforcement exerts some pressure, that inherent authority is offset by other aspects of a stop, such as being in public view, having passersby witness the interaction, and not being vulnerable to any type of abuse. *Acosta*, 363 F.3d at 1149-1150 (citing *Berkemer*, 468 U.S. at 438-39).

In determining whether a *Terry* stop has risen to the level of an arrest, Courts look at the totality of the circumstances, including: (1) the law enforcement purposes served by the detention; (2) the diligence with which the officers pursued the investigation; (3) the scope and intrusiveness of the detention; and (4) the duration of the detention. *Acosta*, 363 F.3d at 1145-46. But distinguishing an investigative stop from a *de facto* arrest requires the Court to use "common sense and ordinary human experience," and it must not adhere to "rigid time limitations" or "bright line rules." *Hardy*, 855 F.2d at 759. Here, all of the factors to be considered weigh in favor of finding that the *Terry* stop did not rise to the level of an arrest requiring *Miranda* warnings.

The most important consideration for analyzing the first factor—the law enforcement purposes served by the detention—is "whether the police detained [the defendant] to pursue a method of investigation that was likely to confirm or

dispel their suspicions quickly, and with a minimum of interference." *Acosta*, 363 F.3d at 1146 (citations and internal quotations omitted; alteration in original). The uncontroverted evidence here shows that the APD officers utilized the "brief, minimally intrusive investigation techniques[s] appropriate under *Terry*." *Id.* (citing *Hardy*, 855 F.2d at 759) (alteration in original). Wade immediately told Demar that he was stopped because "your car smells like weed," and prior to noticing the weapon in the driver-side door, his questions to Demar were all directed to determining if Demar had marijuana in the car, or on his person. (Govt. Ex. 1 at 3:05-5:23.)

The APD officers were diligent in carrying out the on-the-scene investigation, and the duration of the detention was short, satisfying the second and fourth factors. Indeed, the evidence shows that the entire stop was less than 15 minutes, and the decision that Demar would be arrested, instead of given a citation and released, was made after only five to eight minutes had elapsed, when the officers learned of Demar's convicted felon status. (Doc. 35 at 17, 34; Govt. Ex. 1 at 5:38-8:40); *Acosta*, 363 F.3d at 1146-48 (finding that officers were diligent because "[e]ach investigatory act logically led to the next act which was done without delay," and duration of 30 minutes was reasonable in relation to the purpose of the stop); *see also United States v. Simmons*, 172 F.3d 775, 778-781 (11th Cir. 1999) (upholding *Terry* detention lasting 45 minutes); *Hardy*, 855 F.2d at 761 (upholding *Terry* detention lasting 50 minutes).

Finally, when analyzing the third factor, the question is whether or not the scope and intrusiveness of the detention "exceeded the amount reasonably

needed by police to ensure their personal safety." *Acosta*, 363 F.3d at 1146. Officers may take reasonable steps to ensure their safety, and an investigatory stop does not necessarily ripen into an arrest because an officer draws a weapon, handcuffs a detainee, orders a detainee to lie face down on the ground, or secures a detainee in the back of a police car. *Id.* at 1146-47 (citations omitted); *see also United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995) (a police officer handcuffing a suspect, or drawing a weapon, "does not as a matter of course, transform an investigatory stop into an arrest"). Though restriction on the freedom of movement is a factor to consider in determining if a person is under arrest, it is insufficient, alone, to transform a *Terry* stop into a *de facto* arrest. *Acosta*, 363 F.3d at 1147. Here, the fact that Demar was handcuffed after Wade noticed the firearm in the driver-side door did not transform Demar's detention into a *de facto* arrest that required *Miranda* warnings. For example, in *Perdue*, the suspect and his pregnant fiancée were detained in a rural, isolated area not subject to the public's scrutiny, and he was ordered to lie on the ground as officers kept their guns drawn on him as well as on his fiancée. *Acosta*, 363 F.3d at 1150 (citing *United States v. Perdue*, 8 F.3d 1455, 1466 (10th Cir. 1993)). The suspect was questioned while lying face down, and police helicopters circled overhead. *Id.* The Tenth Circuit determined that all of these circumstances would lead a reasonable person to feel he was completely at the mercy of the police, and as a result, even though the stop was within the bounds of *Terry*, *Miranda* warnings might be required. *Acosta*, 363 F.3d at 1150. Contrary to *Perdue*, the circumstances of Demar's *Terry* stop, as in *Acosta*, "did not involve the type of

'highly intrusive' coercive atmosphere that may require *Miranda* warnings even before a formal arrest is made." *Id.*

Demar was in a very public area—pulled over on the side of Boulevard in east Atlanta—visible to anyone who chose to look. (Govt. Ex. 1). And neither Wade, nor any other officer on the scene, drew a weapon, ordered Demar to the ground, or presented any other show of force. (*Id.*) Wade asked Demar "mind if I check you?" before checking his pockets, and Demar consented as shown by the fact that he put his arms up.[8] (*Id.* at 4:12-4:19); *see e.g., United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002) (finding that the defendant demonstrated his consent to allow entry by "yielding the right-of-way" for the officers to enter). Wade also told Demar multiple times that he was not going to handcuff him, and to "relax," because it was "just weed." (*Id.* at 3:51-4:01, 4:33-4:53). It was only after Wade saw the weapon in Demar's driver-side door that Demar was restrained and put in handcuffs, yet even then Wade told Demar that he was handcuffing him because "you got a gun right here, and there's weed right

---

[8]Demar states in a footnote that "[i]t is noteworthy that Wade's search and emptying of Mr. Demar's pockets exceeded the permissible scope of a *Terry* stop." (Doc. 38 at 13 n.4.) Demar cites no authority for this assertion, nor does he otherwise argue or brief the issue. (Docs. 38; 40.) Thus, it is abandoned. Passing reference to an issue is insufficient to raise it. *See Lapaix v. U.S. Atty. Gen.*, 605 F.3d 1138, 1145 (11th Cir. 2010) (failure to offer argument on an issue abandons the issue); *Sepulveda v. U.S. Atty. Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (same); *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (noting that although issue was mentioned in party's statement of the case, "it elaborates no arguments on the merits as to this issue," and the issue was, therefore, deemed waived).

here," but he also still said at that point that Demar was not going to jail. (*Id.* at 5:23-5:38.) As Wade testified, when the officers thought the only offense at issue was marijuana possession, they planned to issue a citation, and that plan changed only upon learning that Demar was a convicted felon, which they learned when, after handcuffing Demar, Wade asked if Demar had ever been convicted of a felony, and Demar immediately responded "yes, sir." (Doc. 35 at 17, 34; Govt. Ex. 1 at 5:38-5:41.) Wade testified that he also verified Demar's convicted felon status by running Demar's identification and criminal history. (Doc. 35 at 17, 34.)

The totality of the circumstances here "were such that a reasonable person in [Demar's] position would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else." *Acosta*, 363 F.3d at 1150; *see also Tukes v. Dugger*, 911 F.2d 508, 515-16 (11th Cir. 1990) ("[w]hether a person is in custody is measured by 'how a reasonable man in the suspect's position would have understood his situation'") (citing *Berkemer*, 468 U.S. at 442)). *Miranda* warnings were, therefore, not required, and all of Demar's statements, including his statement that he was a convicted felon, which was made after he was handcuffed but not yet under arrest, should be ruled admissible. *See e.g., United States v. Middleton*, No. CRIM.A.CR205-025, 2006 WL 156872, at *3 and n.3 (S.D. Ga. Jan. 19, 2006) (finding that officer's "brief detention," of defendant, and "brief line of questioning," which included asking if defendant was a convicted felon, if his rights had been restored, and who owned the gun, were lawful under *Terry*, and

defendant's responses to the queries, which provided probable cause for arrest, did not violate *Miranda* and were admissible) (citing *Berkemer*, 468 U.S. at 442 (holding that "[t]reatment of this sort"—*i.e.*, a single police officer asking defendant a modest number of questions and to perform a simple balancing test at a location visible to passing motorists—"cannot fairly be characterized as the functional equivalent of formal arrest")).

Accordingly, the Court **RECOMMENDS** that Demar's motion to suppress statements, (Doc. 23), be **DENIED**.

## IV.   <u>CONCLUSION</u>

For the above reasons, the Court **RECOMMENDS** that Demar's motion to suppress evidence, (Doc. 22), and motion to suppress statements, (Doc. 23), be **DENIED**.

Defendant has no further motions pending before me. Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**SO RECOMMENDED** February 26, 2024.

J. ELIZABETH McBATH
UNITED STATES MAGISTRATE JUDGE